IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 1, 2019

## IN RE NEVEAH M.

**Appeal from the Circuit Court for Davidson County**
**No. 16A75      Philip E. Smith, Judge**

_____

### No. M2019-00313-COA-R3-PT

_____

Foster parents brought a petition to terminate the parental rights of a biological mother on three grounds, and the trial court granted the petition on all three grounds. Because the foster parents failed to prove any of the grounds by clear and convincing evidence, we reverse the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY, J., joined, and CARMA DENNIS MCGEE, J., concurred in results only.

Joel Stephen Mills, Nashville, Tennessee, for the appellant, Catherina S. M.

Kelli Barr Summers, Brentwood, Tennessee, for the appellees, Christopher G. and Hope G.

Thomas H. Miller, Franklin, Tennessee, guardian ad litem.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

Catherina S.M. ("Mother") gave birth to Neveah M. in February 2014. Mother did not list a father on Neveah's birth certificate and has stated that she does not know the identity of Neveah's father.

At the time of Neveah's birth, Mother was living at the Elam Center, where she was participating in a drug treatment program. She had been required to go to the Elam Center upon pleading guilty to misdemeanor use of drug paraphernalia in December

2013.  After Mother's completion of the program at the Elam Center in April 2014, she and Neveah lived primarily at the home of Charles Jones.

In June 2015, the Department of Children's Services ("DCS" or "the Department") received a referral alleging that Neveah was at risk from Mother's drug use and prostitution and that the home where she was living was unstable and unclean.  On June 18, 2015, a DCS investigator came to Mother's home and asked Mother to submit to a urine drug screen; the results were positive for cocaine.  The Department asked Mother for placement options for Neveah to avoid state custody, and the child was placed with a friend of Mother for a brief period.  Mother then contacted an agency, Jonah's Journey, which placed Neveah with Christopher G. ("Foster Father") and Hope G. ("Foster Mother") (collectively "Foster Parents" or "the petitioners") in late June 2015.  Neveah has lived with Foster Parents since June 2015.

The Department filed a petition for dependency and neglect in July 2015.  On January 7, 2016, the juvenile court granted temporary legal custody to Foster Parents.  On March 14, 2016, the juvenile court entered an order finding Neveah to be a dependent and neglected child due to Mother's use of illegal drugs and failure to provide a safe and stable home for the child.  Mother failed to appear at the final hearing.  The evidence showed that Mother tested positive for cocaine and marijuana on all four drug screens administered to her (October 2015, November 2015, December 2015, January 2016).

On August 15, 2016, Mother filed a motion in juvenile court seeking to reinstate visitation.[1]

Foster Parents filed this petition for termination of Mother's parental rights and adoption on August 31, 2016.  The petition was amended in April 2018.  The amended petition added language stating that the putative father registry had been consulted "within ten (10) working days of the filing of the amended petition" and eliminated one ground for termination included in the original petition.  Both the original and the amended petitions assert the following grounds for termination of Mother's parental rights:  (1) abandonment by willful failure to visit or engage in more than token visitation during the four consecutive months immediately preceding the filing of the petition to terminate parental rights pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(a)(A)(i); (2) abandonment by willful failure to support or to make reasonable payments for support during the relevant four-month period pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(a)(A)(i); and (3) failure to manifest an ability and willingness to assume legal and physical custody or financial responsibility of the child and such custody would pose a risk of substantial harm to the child pursuant to Tenn.

---

[1] As will be discussed below, Mother began living in a residential treatment center in June 2016, and the visitation agreement between her and Foster Parents broke down at that point.

Code Ann. § 36-1-113(g)(14). The petition further alleges that it is in Neveah's best interest that Mother's parental rights be terminated.

The trial

The trial court heard the amended termination and adoption petition over three days, beginning on April 18, 2018, and ending on May 30, 2018. Mother was the first witness to testify for Foster Parents. She stated that she was living on the streets when she became pregnant with Neveah and was incarcerated on drug charges during part of the pregnancy. After her release from the Elam Center in April 2014, she resided primarily with Mr. Jones.

Throughout her testimony, Mother exhibited problems with memory. She agreed that these problems might be attributable to her history of drug use. According to Mother, she had just relapsed into drug use around the time of her birthday (June 6) when DCS came to Mr. Jones's home (in late June 2015) and she tested positive for cocaine. The Department gave Mother the option of finding a placement for Neveah to avoid foster care, and Mother named Tacoya Johnson, a friend. Ms. Johnson could not keep Neveah for very long. Mother testified that she suggested other family members, but Jonah's Journey, an alternative program for the children of incarcerated women, ultimately placed Neveah with Foster Parents in late June 2015.

Mother testified that, after Neveah was placed with Foster Parents, she became homeless and continued to use drugs. She was found guilty of prostitution. Mother was homeless from June through September 2015. She then moved into a house owned by Jerry Kendrick that was located next door to Mr. Jones's house. Mr. Kendrick's house was in foreclosure and had no electricity or running water. Mother's boyfriend, Samuel Peoples, paid Mr. Kendrick $100 a month in rent. Mother stayed in Mr. Kendrick's house from September 2015 through June 2016, when she had another baby, Cairo. Asked about the condition of Mr. Kendrick's house, Mother acknowledged that the house was not an appropriate place for Neveah to live.

Mother stated that she and Cairo both tested positive for cocaine at the time of the child's birth. The Department became involved and helped Mother reenter the Elam Center directly from the hospital. Mother stayed at the Elam Center until October 30, 2016, when she was discharged to a women's shelter. She and Cairo remained at the women's shelter until November 15, 2016, when they moved into a rooming house. In September 2017, Mother, Cairo, and Mr. Peoples moved to a two-bedroom apartment on Oak Valley Drive in Nashville for which they paid $574 a month in rent.

When Neveah was initially removed from Mother's custody, the child was about 18 months old. The Department required that visitation be supervised by Foster Parents. Mother testified that, in the beginning, Mother and Foster Parents agreed to visit at

McDonald's during a certain hour once a week. They later moved the visits to Subway. After "a very long period of time," the visits changed to Coleman Park. Mother had Foster Parents' phone numbers. She acknowledged that she had the ability to communicate with them if she needed to do so. According to Mother, Foster Parents changed the visitation from once a week to every other week "immediately after they were given guardianship on January 7th of 2016 [date of the hearing at which Foster Parents were granted temporary legal custody]."

Petitioners' counsel questioned Mother about her visits with Neveah. As to the visit scheduled for January 14, 2016, Mother could not recall whether she attended. She remembered attending visits on January 7, January 21, and January 28, 2016. Mother was questioned as to whether she had opportunities to visit on February 4, 11, 18, and 23, and she responded that Foster Mother had changed the visits to every two weeks, "so there's no way we could have had all those visits." When asked about a visit on February 4, Mother said that she could not recall. She denied telling Foster Mother that she did not feel like going to a visit on February 18. Mother admitted that there was confusion concerning a party for Neveah on February 23, and that the visit did not happen on that day. The parties worked out a visit for February 25.

Mother admitted that she did not appear for the dependency and neglect hearing on March 2, 2016. She testified that she was sick with swollen joints and severe nausea. Mother acknowledged that her attorney informed her that she "needed to be there with reasonable effort." She stated that she did not understand that she "would lose my child if I didn't go to this court hearing." She claimed that Mr. Jones was not able to transport her to the hearing and that she called and informed someone at the clerk's office that she was not able to get there. Mother testified that Mr. Jones took her to visit Neveah the day after court, but he did not take her to court.

Mother had a visit with Neveah on March 31, 2016, and another on April 8 at Coleman Park. Mother denied missing a visit at Coleman Park and failing to call on April 22. Mother and Neveah visited at the park on May 5; she did not recall missing visits and failing to call on May 19 and June 2. There was a successful visit on June 16. Thereafter, on the day Cairo was born, Mother called Foster Mother to inform her of the birth. She agreed that she called Foster Mother again a few days later and that she asked for Neveah to come to the hospital for a visit. Mother did not recall calling Foster Mother on the morning of July 9 and asking her to bring Neveah for a visit at the Elam Center that afternoon. Mother testified, however, that she was not allowed to use the phone until the following Saturday and stated that she made a similar phone call on another Saturday in July. Mother asserted that she made calls to Foster Mother from the Elam Center in August and September 2016 about visitation, "at least five times a week."

Mr. Jones was Mother's primary means of transportation to visits; otherwise, she walked. Mother stated that she may have missed six visits between July 2015 and March

2016. From April 2016 through September 2016, she stated, the main problems she had attending visits were her health and lack of transportation. She did not recall any of the times she missed visits being attributable to drug use. Questioned about the dependency and neglect order, Mother admitted receiving a copy of the order, but she stated that she did not read it carefully. She was aware that the order allowed her four hours of supervised visitation every month.

When first questioned about whether she worked before Neveah was born, Mother testified in the negative, stating that she "took nurse aid training." She then realized that she participated in the training after Neveah's birth. Upon further questioning, Mother acknowledged that she worked in a mechanical shop sweeping up oil for $10 an hour and cleaning up houses for Mr. Jones while pregnant with Neveah. Mother testified that she did not have a job after she gave birth to Neveah. In her deposition, Mother stated:

> I was just cleaning houses, period. I started out with him [Mr. Jones]. I might have cleaned another friend's house. But between him and her, that was how I survived while my boyfriend was in jail.

At the hearing, Mother denied cleaning any house other than Mr. Jones's house. When confronted by the trial court with the apparent inconsistency between her testimony at deposition and at trial, Mother asserted that the other person was a man, not a woman, and that her deposition testimony was "a mistake."

Mother testified that, after her discharge from the Elam Center following Neveah's birth, she did not work because she was breastfeeding and was having problems pumping milk. According to Mother's testimony at her deposition and at the hearing, she was not qualified to work after Neveah's birth and received government benefits as a result.[2] Even after Neveah was removed from her custody in June 2015, Mother did not obtain employment; she stated that she was unable to get a job because she was ill, did not have any identification, and was homeless. The day of Neveah's removal, Mother left her belongings at Mr. Jones's house on a temporary basis "until I got into a program." Then, she had trouble finding him to get into his house and, when there, could not find her identification. Mother believed that she had to travel back to Toledo, Ohio to get new identification and that the process would take six to twelve weeks.

At the time of the hearing, Mother was 34 years old. She had gone through work training and obtained employment in November 2016. Mother testified that, in January 2017, she began offering Foster Parents financial support (never more than $20) for

---

[2] We fully considered Mother's statements on this subject as well as her testimony that, even after Neveah was removed from her custody, she remained unable to work due, in part, to homelessness. As we discuss below, the burden was upon the petitioners to provide clear and convincing evidence that Mother had the ability to provide support for her child and failed to do so during the relevant time period.

Neveah, but they would not accept it. Mother admitted that, prior to Neveah's removal, when she and the child lived with Mr. Jones, Mr. Peoples provided $300 for rent each month.

When asked whether she had any mental health conditions, Mother initially responded that she did not. She then immediately acknowledged that she had been diagnosed with a bipolar disorder and depression; she was currently receiving counseling through a mental health cooperative. Mother admitted that she had a total of eight children, two of whom lived with their fathers and four of whom had been found dependent and neglected and removed from her care. Mother acknowledged that she used cocaine four or five days prior to the birth of her eighth child, Cairo; she alleged that she did not know she was pregnant at that time.

The next witness for the petitioners was Mr. Jones, who testified that he first met Mother on the street and would give her money "because she was messed up." Although Mother said she was pregnant by her boyfriend, Mitchell Lee, testing showed that he was not Neveah's father. After Neveah was born, Mother and Mr. Lee moved in with Mr. Jones. Mother promised Mr. Jones that she would not take drugs anymore, but she eventually returned to her old habits. According to Mr. Jones, Mr. Peoples took care of Neveah while Mother was out on the streets at night. Mr. Jones testified that Mother would nurse Neveah while she was using drugs.

Mr. Jones testified that he helped Mother get to and from visits with Neveah once the child lived with Foster Parents and that there were times when Mother did not want to go to the visits. According to him, "unless it was the first of the month, she was intoxicated." He saw her on the streets, "prostituting" and "chasing cars." Mr. Jones denied that he ever refused to take Mother to visitation. In his opinion, drugs and alcohol kept Mother from visiting Neveah. Mr. Jones stated that he gave money for Neveah, not for child support.

Mr. Jones testified that he was relieved when Foster Parents came into Neveah's life because the child "needed help." As to Neveah's relationship with Foster Parents, Mr. Jones stated: "She [Mother] knows that baby loves them people." Asked to describe how Neveah acted around Foster Parents, Mr. Jones testified:

Oh, man. That's momma bear there. You can't—she hugs on her. She squeezes on her. She cuts me and [Foster Father] off, you know. But, you know, she's a good little baby. She just hugs you and kisses you and gives you so much love, you know.

He stated that, at the visits, when Neveah fell down, was upset, or needed to go to the bathroom, she would go to Foster Mother, not to Mother.

- 6 -

Jennifer Johnson, Foster Mother's sister, testified that she lived in the same household with Foster Parents and Neveah. She described Neveah's close relationship with Foster Parents. Ms. Johnson attended two or three visits with Mother in November 2017 and observed that Mother and the two children played together without much interaction. When Neveah returned from visits with Mother, Ms. Johnson observed that Neveah generally did not want to talk and tended to be tired, angry, and not in a good mood. After a few visits, Ms. Johnson heard Neveah screaming or crying out in the night.

The petitioners called Mariah Benimon, a program specialist for the Department, as their next witness. Ms. Benimon was the case manager for Mother's family beginning in September 2015. She stated that Mother's main issue was drug use and that she provided drug screens, information about drug treatment, and visitation with Neveah once a month. While Ms. Benimon was case manager, Mother did not enter into drug treatment; when her time with the case was ending in January 2016, Mother was planning to enter the Elam Center drug program at Meharry Medical Center. Ms. Benimon testified that her involvement with Mother's case ended because of a DCS policy providing that, after 120 days without a parent entering necessary drug treatment, the status of the case was reviewed. Mother's case was closed due to her noncompliance. Mother failed all four of the drug screens provided by Ms. Benimon during her time on the case. At Mother's court date in January 2016, she informed Ms. Benimon that she had obtained her identification and birth certificate; these documents had presented a problem in the past, and Ms. Benimon had provided Mother with contact information regarding the vital records office in Ohio.

According to Ms. Benimon, Jonah's Journey arranged and facilitated Neveah's placement with Foster Parents. Mother did not have stable housing or income at that time. Mother told Ms. Benimon that she had an abscess in her foot, but did not specifically claim that this condition prevented her from working. During the time that Mother was testing positive for drugs, Ms. Benimon learned that Mother was pregnant again.

On cross-examination, Ms. Benimon stated that Mother attended some, but not all, of her weekly visits with Neveah. Foster Parents complained to her that sometimes they went to the visits and Mother did not show up.

Foster Mother testified that Neveah began living with Foster Parents on June 29, 2015. Initially, they set up visitation with Mother for one-hour periods on Thursday evenings, first at a McDonald's and later at a Subway restaurant. Foster Mother stated that Mother came to some visits but missed others; Foster Mother kept a record of the visits on a calendar beginning in 2016. Mother saw Neveah for a visit at court on January 7, 2016. She did not appear at the scheduled visitation on January 14; she attended the visits on January 21 and January 28. Mother did not come on February 4 and neglected

to call Foster Mother to let her know that she was not coming. Mother attended the visit on February 11, and the February 18 visit was canceled because the child was sick.

Foster Mother agreed to accommodate Mother by moving a visit to February 23 so that Mother could attend a birthday party for the child. Foster Parents brought the child to Mother's home at the appointed time for the party, but they found that Mother was not there. After about twenty minutes, Foster Parents were able to contact Mother and learned that there had been a mix-up. By that time, Neveah was tired and hungry, so they left and agreed to meet on another day. Foster Parents met Mother a few days later at Subway and they celebrated with her then. On March 3, 2016, Mother did not appear at the scheduled visit and did not call, according to Foster Mother's calendar. Mother also failed to show up for the visit on March 10. The March 17 visit was cancelled. On March 24, Mother did not show up or call; and on March 31, Mother did not show up.

Foster Mother testified that, on March 31, 2016, she decided that Subway was not a good place to have the visits any longer because Neveah "would run around and interrupt the business." She testified that, "we[3] looked at the map" and decided that Coleman Park was a good halfway point between their home and the place where they thought Mother was living. There was a recreation center and a library at Coleman Park. Foster Mother further stated that, "we[4] agreed at that point in time that that's where we would start meeting, and we would meet every other week." In early April, the parties met on April 8 (a Friday) instead of the usual Thursday due to bad weather. Foster Mother testified that she had several phone numbers for Mother and that she also had the number for Mr. Jones, so she could contact Mother to inform her of changes in the schedule. Mother did not appear on April 22 (a Friday, again due to bad weather).

Mother attended a visit on May 5, 2016, but did not appear or call on May 19 or June 2. Mother attended the visit on June 16; Foster Mother knew that Mother was pregnant with Cairo by that point. As Foster Parents were on their way to the park for a visit on June 30, Foster Mother received a call from Mother informing her that she had recently given birth to a son. Mother wanted Foster Mother to bring Neveah to the hospital to meet her brother. Foster Mother said that she could not change her plans. In July, Mother called to tell Foster Mother that she would be staying at the Elam Center for inpatient services. Mother did not attend either of the two visits in July. Mother called Foster Mother on the morning of July 9 "stating that they were having family visitation day from 2:00 to 4:00 and if we could bring Neveah down to that visit." Foster Mother already had plans that day and told Mother she would not be able to bring Neveah to the Elam Center that day. Mother called Foster Mother again on July 23, another family visitation day, and asked her to bring Neveah that day. Those were the only two calls

---

[3] The "we" in this statement appears to refer to Foster Parents.

[4] Again, based upon the context, the "we" appears to refer to Foster Parents.

- 8 -

Foster Mother received from Mother that month. Foster Mother went to the park for the two visit days in August, but Mother did not appear for either visit.

The trial court asked Foster Mother how many opportunities for visitation Mother had between April 30 and September 30, 2016, and Foster Mother counted nine such opportunities. Foster Mother testified that Mother showed up for only two of those nine visits.

Foster Mother testified that Mother first mentioned that she was pregnant again in August 2015 and then confirmed that information in December 2015. Foster Mother estimated that she was first able to tell that Mother was pregnant from her physical appearance in February or March 2016.

When asked, Foster Mother stated that there were times when she was concerned that Mother was under the influence of drugs during her visits. Mother would say and do unusual things. At times, she appeared "lethargic, kind of out of sorts." Foster Mother stated: "I had noted on one visitation where her sleeve went up, and she had like open wounds. And she talked many times about going to the emergency room for this thing or that thing." According to Foster Mother, Mother made statements about how long she liked to keep her children:

A. It was in April or May of 2016, she stated that she liked to keep her children about 18 months.
Q. Did she say why?
A. No. She didn't indicate why.
Q. Okay. Did she say anything that was unusual to you while she was pregnant with her son about him?
A. She had asked us on a couple of occasions whether we would consider adopting him.
Q. Did she say anything else about the baby while she was pregnant?
A. She had also stated the one day that she was trying to go ahead and have him. She was tired of being pregnant.

As to Neveah's relationship with Mother, Foster Mother testified that, from the time the visitation stopped when Mother became a resident at the Elam Center, Neveah stopped calling Mother "mommy" or "mom." When visits resumed, Neveah called Mother by her nickname, "Cat." Asked to describe any changes in the bond between Neveah and Mother, Foster Mother testified that "the bond definitely decreased while [Mother] was not doing her visitations." Foster Mother stated that Neveah called Foster Mother "Mommy" and that, if she fell down or hurt herself during visitation, Neveah always went to Foster Mother for reassurance. If she needed to go to the bathroom or was hungry, the child would go to Foster Mother.

Foster Mother described Neveah as having an outgoing, bubbly personality. Around Mother, the child tended to be "a little bit more reserved." When she initially arrived at visits, Neveah would be excited to see Mother, but she always needed to know where Foster Mother was and would check in with her several times during the visit. Typically, Neveah would not want to stay at the visit for the entire time; she would be ready to leave after between 45 minutes and an hour and a half. There were times when Mother would ask Neveah to come give her a hug and the child would be resistant; Foster Mother would encourage her to give Mother a hug. Neveah seemed to feel more comfortable with Mr. Peoples than she did with Mother. Foster Mother viewed the relationship between Mother and Neveah as that of playmates. Neveah never asked about Mother.

Foster Mother described Neveah's attachment to her and said that the child viewed her as her primary caregiver. Foster Mother stated that Neveah has significant food allergies. Although she explained this to Mother, Mother continued to bring inappropriate foods to visits for Neveah until Mother finally "got on board" with the child's restricted diet. According to Foster Mother, Mother started paying child support in January 2017.

Foster Father testified that he attended most of the visitations and agreed with Foster Mother's descriptions. Asked about his relationship with Neveah, Foster Father stated that he and the child talked together, went on walks, and played together.

Robin Wilson, Mother's first cousin, testified on her behalf. She worked as chief investigator for the City of Toledo's Office of Diversity Inclusion. Ms. Wilson had never met Neveah. She was there with four of Mother's family members and had become aware of Mother's situation three or four months earlier. Ms. Wilson expressed her willingness to petition for guardianship or to support Mother should Mother gain custody of Neveah. Mother's attorney stated that the other family members would offer similar testimony.

Raven Starks, the case manager who managed Mother's mental and physical health, living arrangements, and other goals she desired to accomplish, testified for the defense. Ms. Starks scheduled Mother's appointments with a mental health provider. She testified that Mother had attended every appointment and that she was not currently taking any medication. As far as Ms. Starks knew, Mother was in compliance with her mental health provider's requirements. With respect to Mother's physical health, she had lost ten pounds within the last five months. Ms. Starks had been to Mother's two-bedroom apartment; every time she had visited, the home was neat and clean. The bedrooms had beds and dressers in them, and the house seemed to be in order. Ms. Starks stated that the home was adequate for minor children and that she did not have any concerns about the safety of the home. She did not think that Mother was using any kind

of illegal drugs or alcohol. Based upon her observations, Ms. Starks felt that Mother had a normal relationship with her son, Cairo, who seemed well-kept and well-fed.

On cross-examination, Ms. Starks testified that Mother's current diagnosis was major depressive disorder. She was not currently prescribed any medication, but she was attending therapy once or twice a month.

Mother returned to the stand to testify on her own behalf. She testified about the period of time from April 30 through August 31, 2016. Mother stated that, during the month of May 2016, she visited Neveah three times. She disagreed with Foster Mother's testimony that she missed two visits that month. Mother denied telling Foster Mother that she thought about aborting her pregnancy, but admitted saying that she was having a difficult pregnancy. She also denied asking Foster Mother to adopt the baby. Mother testified that, with respect to the month of June 2016, she believed she visited Neveah twice. In particular, Mother testified: "I think it might have been just once, but I want to say twice before I gave birth to Cairo and I was not able to." Cairo was born at the end of June 2016.

During the month of July 2016, Mother was in the Elam Center, and she testified that patients were not generally permitted to leave without supervision. She had to give advance notice and get approval from the clinical director before leaving the facility. According to Mother, Foster Parents knew she was an inpatient and would not be able to attend visit at the park. She asked them to bring Neveah to the Elam Center for visits. Mother denied that she only called on the mornings of the desired visits. She testified as follows:

> A. I've been calling [Foster Mother] since the day I gave birth to my son . . . . Let's see. We went to school from 9:00 in the morning to 5:00 in the afternoon. So from 5:00 to I want to say 8:30/9:00 when I would go to bed, I would be trying to call her on the phone line. Maybe twice a day daily for those four months.
> Q. Was that on the personal line, or was that through the center's line?
> A. It was the center's line.
> Q. Did you have a personal phone?
> A. No. But I was able to use—three or four different people who were working on my case, I was able to use their phones during my crisis of not being able to contact them. It was considered a crisis.
> . . . .
> Q. Would you have liked to have had your daughter with you there at [the Elam Center]?
> A. Yes.

- 11 -

Q.  Did you ask [Foster Parents] to – if they were willing to consider that?

A.  I asked them several times.  Let's see.  During the time I was there and during the court proceedings, we had spoken about her bringing my child to the visits and keeping me in contact with my child.  That was always very important to me.

Q.  Did you ever ask the juvenile court to intervene in the court proceedings – I mean intervene in the reunification with your daughter?

A.  If that's how you want to put it.  I asked them to restart visitation, because I knew I was supposed to be getting visits, but they weren't being set up at all.

Mother testified that, at the time of trial, she lived in a two-bedroom apartment in Nashville with Mr. Peoples and Cairo.  Since January 18, 2018, she had been employed at the Nashville Aquarium for $11 an hour.  She had been consistently employed since November 25, 2016.

Samuel Peoples, Cairo's father and Mother's boyfriend, testified that he and Mother learned Mother was pregnant with Cairo around January 2016.

Samuel Scales, clinical director of the Elam Center, testified that he made two or three phone calls to Foster Parents on behalf of Mother while she was in the residential program in 2016.  He was never able to make contact.

## Trial court's ruling

The trial court entered an order on January 31, 2019, including findings of fact and conclusions of law.  The trial court found by clear and convincing evidence that Mother's parental rights should be terminated based upon all three grounds alleged in the petition: (1) abandonment by failure to visit during the four consecutive months immediately preceding the filing of the petition to terminate pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(a)(A)(i); (2) abandonment by willful failure to support during the relevant four-month period pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(a)(A)(i); and (3) failure to manifest an ability and willingness to assume legal and physical custody or financial responsibility of the child and such custody would pose a risk of substantial harm to the child pursuant to Tenn. Code Ann. § 36-1-113(g)(14).  The trial court further found by clear and convincing evidence that termination of Mother's parental rights was in the child's best interest.

STANDARDS GOVERNING PARENTAL TERMINATION TRIAL PROCEEDINGS AND
APPELLATE REVIEW

The Tennessee Supreme Court has described the appellate review of parental termination cases as follows:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016) (citations omitted); *see also In re Gabriella D.*, 531 S.W.3d 662, 680 (Tenn. 2017).

The termination of a parent's rights is one of the most serious decisions courts make. As the United States Supreme Court has said, "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *Santosky v. Kramer*, 455 U.S. 745, 787 (1982). "Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger," *In re W.B., IV*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *6 (Tenn. Ct. App. Apr. 29, 2005), and of "severing forever all legal rights and obligations of the parent or guardian," Tenn. Code Ann. § 36-1-113(l)(1).

A parent has a fundamental right, based in both the federal and state constitutions, to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996) (citing *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994)); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995) (citing *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993)). This right "is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d at 521 (citing U.S. Const. amend. XIV, § 1; Tenn. Const. art. 1, § 8). While this right is fundamental, it is not absolute. *Id.* at 522. The State may interfere with parental rights in

certain circumstances. *Id.* at 522-23; *In re Angela E.*, 303 S.W.3d at 250-51. Our legislature has listed the grounds upon which termination proceedings may be brought. *See* Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and a parent's rights may be terminated only where a statutory basis exists, *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must find by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re Kaliyah S.*, 455 S.W.3d 533, 552 (Tenn. 2015); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "'Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings.'" *In re Carrington H.*, 483 S.W.3d at 522 (quoting *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted)). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). As a reviewing court, we "must 'distinguish between the specific facts found by the trial court and the combined weight of those facts.'" *In re Keri C.*, 384 S.W.3d 731, 744 (Tenn. Ct. App. 2010) (quoting *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007)). Then, we must determine "whether the combined weight of the facts . . . clearly and convincingly establishes all of the elements required to terminate" a parent's rights. *Id.* (citing *In re Tiffany B.*, 228 S.W.3d at 156, and *In re S.M.*, 149 S.W.3d 632, 640 (Tenn. Ct. App. 2004)). "When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are 'uniquely positioned to observe the demeanor and conduct of witnesses.'" *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (quoting *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)).

Once a ground for termination is established by clear and convincing evidence, the trial court or the reviewing court conducts a best interests analysis. *In re Angela E.*, 303 S.W.3d at 251 (citing *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005), and *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004)). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *Id.* at 254. The existence of a ground for termination "does not inexorably lead to the conclusion that termination of a parent's rights is in the best interest of the child." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006).

ANALYSIS

I.  Applicable four-month period under Tenn. Code Ann. § 36-1-102(1)(A)(i).

The first issue we must resolve is the appropriate four-month period to apply to the petitioners' termination claims pursuant to Tenn. Code Ann. § 36-1-102(1)(A)(i).  When Foster Parents filed their original petition for termination and adoption on August 31, 2016, Tenn. Code Ann. § 36-1-102(1)(A)(i) defined abandonment as follows:

> For a *period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights* of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child.

(Emphasis added).

On April 11, 2018, the day the case was originally set to be heard, the trial court granted Foster Parents a continuance to allow them to file an amended petition.  Foster Parents filed their amended petition on April 12, 2018.  The amended petition added the following language:

> 9.  The Putative Father Registry maintained by the Tennessee Department of Children's Services has been consulted within ten (10) working days of the filing of the amended petition.  A copy of the response stating whether there exists any claim on the registry to the paternity of the child shall be filed with the court upon receipt.[5]

This language was added to satisfy the requirement in Tenn. Code Ann. § 36-1-113(d)(3)(A)(i) (July 2016) that a termination petition shall contain a verified statement that:

> The putative father registry maintained by the department has been consulted within ten (10) working days of the filing of the petition and shall state whether there exists any claim on the registry to the paternity of the child who is the subject of the termination or adoption petition.

At trial, Mother asserted that the appropriate four-month period was the four months prior to the filing of the amended petition; and Foster Parents argued that the four

---

[5] No claims were filed with the putative father registry.

months should be those before the original petition. The trial court applied the relation back doctrine of Tenn. R. Civ. P. 15 and ruled that the appropriate time period to consider was the four months before the filing of the original petition. For the reasons discussed below, we agree with the trial court's decision.

Tennessee Rule of Civil Procedure 15.03 addresses the relation back of amendments to pleadings:

> *Whenever the claim or defense asserted in amended pleadings arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading.* An amendment changing the party or the naming of the party by or against whom a claim is asserted relates back if the foregoing provision is satisfied and if, within the period provided by law for commencing an action or within 120 days after commencement of the action, the party to be brought in by amendment (1) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

(Emphasis added). In *In re J.G.H., Jr.*, No. W2008-01913-COA-R3-PT, 2009 WL 2502003, at *7 (Tenn. Ct. App. Aug. 17, 2009), the trial court permitted the foster parents to amend their termination petition to add the notice regarding expedited appeal required by Tenn. R. Civ. P. 9A. Furthermore, the trial court denied the mother's oral motion to dismiss and gave the amended petition retroactive effect to the filing date of the original petition. *In re J.G.H., Jr.*, 2009 WL 2502003, at *7. This court agreed with the reasoning of a previous case, *In re S.R.M.*, No. E2008-01359-COA-R3-PT, 2009 WL 837715, at *14 (Tenn. Ct. App. Mar. 27, 2009), and held that the failure to include the Rule 9A notice was harmless error and that the trial court did not err in allowing the amendment to the petition. *In re J.G.H., Jr.*, 2009 WL 2502003, at *12. The parties disagreed about whether the four-month period preceding the initial petition or the four-month period preceding the amendment should be considered in determining whether the mother had abandoned her child. *Id.* at *13. We agreed with the trial court that the four months preceding the initial filing was the appropriate period to consider. *Id.*

The more recent case of *In re Chase L.*, No. M2017-02362-COA-R3-PT, 2018 WL 3203109, at *9 (Tenn. Ct. App. June 29, 2018), fleshes out the analysis as it involves a distinct set of facts. In *In re Chase L.*, DCS filed an "amended petition," which added two new grounds for termination, and the termination trial was continued. *In re Chase L.*, 2018 WL 3203109, at *2. Discussing the general rule of relation back as set forth in Tenn. R. Civ. P. 15.03, the court stated:

[T]his Court has previously held that where an "amendment" to a termination petition did not constitute a separate and distinct petition, the proper four month period to consider was the four months preceding the filing of the original petition, not the amendment. *See In re J.G.H., Jr.,* No. W2008-01913-COA-R3-PT, 2009 WL 2502003, at *13 (Tenn. Ct. App. Aug. 17, 2009) (citing *In re S.R.M.*, No. E2008-01359-COA-R3-PT, 2009 WL 837715 at *15 (Tenn. Ct. App. Mar. 27, 2009)).

The same is not true in this case, however, due to the nature of the purported "amended" petition lodged by DCS. Rather than merely include additional factual averments concerning the grounds previously alleged or address deficiencies related to procedural rules applicable in termination proceedings, the "amended" petition in this case sets forth an entirely new ground based upon events that occurred following the filing of the initial petition. As such, our review reveals that DCS's attempt to raise the ground of abandonment by wanton disregard was not governed by Rule 15.01, regarding amendment, but by Rule 15.04, regarding supplemental pleadings.

. . . Because DCS is relying on an event that occurred after the filing of the original termination petition to support this ground, i.e. Mother's incarceration, it is this Court's view that DCS's "amended" petition should be considered a supplemental pleading.

*Id.* at *9–10. Thus, if the amendment to the petition does not set forth new grounds for relief or allege additional acts that occurred after the filing of the original petition, Tenn. R. Civ. P. 15.03 contemplates that the amendment relates back to the original filing date.

Mother's argument to avoid the applicability of Tenn. R. Civ. P. 15.03 in the present case relies upon *In re A.S.C.,* No. E2013-01830-COA-R3-PT, 2014 WL 4269114 (Tenn. Ct. App. Aug. 29, 2014). In *In re A.S.C.,* the original petition was filed by the mother against the father. *In re A.S.C.*, 2014 WL 4269114, at *1. After the mother married, she and the child's stepfather filed an amended petition along with a motion to join the stepfather. *Id.* The trial court entered an agreed order to allow the mother and stepfather to file the amended petition, terminated the father's rights, and allowed the stepfather to adopt the child. *Id.* at *2-3. On appeal, this court considered the appropriate four-month period for purposes of Tenn. Code Ann. § 36-1-102(1)(A)(i). *Id.* at *4-6. The court went back to Tenn. Code Ann. § 36-1-113(b) to determine who had standing to bring a termination petition and noted that the statute did not give one parent alone the right to bring a termination action against the other parent. *Id.* at *6 (citing *Osborn*, 127 S.W.3d at 740). Therefore, the court concluded that the mother lacked standing to bring the original petition against the father and that the original petition was "null and void." *Id.* It followed from that conclusion that "there can be no 'relation back' to a pleading—

in this case, the original petition by Mother—that was a nullity from the start." *Id.* Furthermore, we held that the trial court lacked subject matter jurisdiction to hear the mother's initial petition because she did not have standing. *Id.* Because the mother's original petition was "a nullity," this court determined that the four-month time period under Tenn. Code Ann. § 36-1-102(1)(A)(i) should be measured from the filing of the amended petition by the mother and stepfather. *Id.* at *6.

In reaching its determination, the court in *In re A.S.C.* relied upon the decision of our Supreme Court in *In re D.L.B.*, 118 S.W.3d 360, 362 (Tenn. 2003), a case in which the Court had to decide the proper four-month period to consider under Tenn. Code Ann. § 36-1-102(1)(A)(i) for purposes of non-support and failure to visit. *In re A.S.C.*, 2014 WL 4269114, at *6-7. In May 2000, the Court Appointed Special Advocate ("CASA") filed a petition to terminate the parental rights of the child's mother and her husband. *In re D.L.B.*, 118 S.W.3d at 364. The juvenile court terminated the parental rights of the mother (and her husband). *Id.* The juvenile court later allowed CASA to amend the petition to add Mr. Moore, whom the mother believed to be the child's biological father. *Id.* Paternity testing revealed Mr. Moore to be the child's biological father. *Id.* In March 2001, the juvenile court dismissed the amended petition, and, in January 2001, the foster parents filed a termination and adoption petition in chancery court. *Id.* The chancery court terminated Mr. Moore's parental rights based solely upon abandonment during the four-month period prior to the filing of CASA's juvenile court petition, and the Court of Appeals affirmed. *Id.*

The Supreme Court reversed the decision of the lower courts. *Id.* at 367-68. Mr. Moore paid child support and visited the child during the four months preceding the filing of the termination petition in chancery court in January 2001, but the lower courts relied upon the four months preceding the filing of the juvenile court action in May 2000 in evaluating the abandonment grounds. *Id.* at 365. Thus, the Court's determination regarding the proper four-month period was key. Construing the language of Tenn. Code Ann. § 36-1-102(a)(A)(i), the Court focused upon the phrases "*a* proceeding or pleading to terminate parental rights" and "*the* petition for termination of parental rights or adoption." *Id.* at 365-66. Reading the section as a whole, the Court concluded that Tenn. Code Ann. § 36-1-102(1)(A)(i) requires that the willful failure to support or visit "must have occurred in the four months immediately preceding the filing of the petition currently before the court." *Id.* at 366. Thus, the Court determined, Mr. Moore's conduct in the four months prior to the January 2001 chancery court petition was the relevant conduct. *Id.*

*In re A.S.C.* and *In re D.L.B.* are readily distinguishable from the present case. These cases involved multiple petitions for termination with different parties. (The language of Tenn. R. Civ. P. 15.03 specifically addresses the effect of adding parties.) In *In re A.S.C.*, the first petition was null and void because the petitioner lacked standing to bring the action. *In re A.S.C.*, 2014 WL 4269114, at *6. Similarly, in *In re D.L.B.*, the

Court rejected the lower courts' decisions measuring the four months from a prior petition filed in a different court rather than from the petition currently before the trial court. *In re D.L.B.*, 118 S.W.3d at 366. The present case does not involve a new petition with new parties. Rather, it involves the correction of an omission in the original petition—an amendment that fits within the first sentence of Tenn. R. Civ. P. 15.03 because it relates to "conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading."

We find no error in the trial court's determination that the pertinent four-month period is before the filing of the original petition on August 31, 2016.

II. Abandonment by willful failure to visit.

At the time the original termination petition was filed on August 31, 2016, Tenn. Code Ann. § 36-1-102(1)(A)(i) defined abandonment as follows:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child.

Thus, we must determine whether Mother willfully failed to visit Neveah during the time period from April 30, 2016, through August 30, 2016.

A key component of the foregoing definition of abandonment is the willfulness of the parent's conduct. *In re Audrey S.*, 182 S.W.3d at 863. In August 2016, the statutory definition of "willfully failed to visit" was "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E) (2016). Tennessee Code Annotated section 36-1-102(1)(C) (2016) defined "token visitation," in part, as "perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." To prove that a parent acted willfully under Tenn. Code Ann. § 36-1-102(1)(A)(i), a petitioner must show by clear and convincing evidence that "a parent who failed to visit or support had the capacity to do so, made no attempt to do so, and had no justifiable excuse for not doing so." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013); *see also In re Audrey S.*, 182 S.W.3d at 863-64 (stating that a person acts willfully if he or she knows what he or she is doing and has the intention to do what he or she is doing). The issue of "[w]hether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful

abandonment, however, is a question of law." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007)).

Foster Mother testified that, during the time period from April 30, 2016, through August 30, 2016, Mother had nine opportunities to visit Neveah and she appeared for only two of those visits. Mother gave birth to Cairo at the end of June 2016, and then she was moved directly into the inpatient treatment program at the Elam Center, where she was restricted in her ability to leave the center without supervision. Foster Parents continued to appear for visits every other week on Thursdays at Coleman Park (despite likely knowing that Mother would not be there). Foster Mother testified that Mother called her twice on a Saturday morning to ask if they could bring Neveah to visit her at the Elam Center that afternoon, and that Foster Parents refused because they already had plans for the day. She denied receiving any other calls from Mother. Mother testified that she made numerous attempts to contact the Foster Parents: "Maybe twice a day daily for those four months." Mother did not have her cell phone at the Elam Center, so she had to use telephones at the center to make calls.

Although the trial court generally discounted Mother's credibility, the record contains other evidence in support of her assertions that she attempted to maintain visitation with Neveah during her time at the Elam Center. In a motion to restart visitation filed in juvenile court on August 15, 2016, Mother asserted that she had not been able to contact Foster Parents since June 30, 2016, and that Foster Parents had "stop[ped] all visitation and contact." Moreover, Mr. Scales, clinical director at the Elam Center, testified that he made two or three phone calls to Foster Parents on Mother's behalf in 2016 but was unable to make contact.[6]

Under the version of Tenn. Code Ann. § 36-1-102(1)(A)(i) in effect when Foster Parents filed their petition in August 2016, Foster Parents had the burden of proving that

---

[6] The trial court gave Mr. Scales's testimony "little weight" based upon his alleged "inconsistency and lack of recollection." The trial court stated: "He testified that he was not sure of any phone calls [Mother] received from [Foster Parents]. However, a letter introduced as an exhibit disputes this recollection." The letter from Mr. Scales, is quoted in its totality below, and we find that it evidences no inconsistency:

> [Mother], . . . was a client in our Rainbow Treatment Program [at the Elam Center]. During her stay here, I assisted her in making phone calls to [Foster Parents], who I am told has custody of her children. None of our attempts resulting in a contact and I am not aware of their returning any of her calls. During her stay with us she had her infant son, Cairo and she was attentive and caring of this child.

We find clear and convincing evidence to reject the trial court's credibility determination regarding Mr. Scales. *See Franklin Cnty. Bd. of Educ. v. Crabtree*, 337 S.W.3d 808, 811 (Tenn. Ct. App. 2010).

Mother willfully failed to visit during the relevant time period.[7] In its decision, the trial court stated that Mother's "failure to visit was voluntary and an intentional act" and that "[h]er failure to visit was done as a result of her own free will." We respectfully disagree. Mother's ability to leave the Elam Center was restricted. The trial court seems to focus on the period of time before Mother was in the treatment center by mentioning the availability of transportation from Mr. Jones. Once Mother entered the treatment center, however, she was no longer able to attend visits at the park without special permission and supervision. Based upon the record, we cannot say that Foster Parents proved by clear and convincing evidence that Mother willfully failed to visit Neveah during the four months preceding the filing of the original termination petition.

III. Abandonment by willful failure to support.

There is no dispute that Mother failed to provide support during the relevant four-month time period. The issue is whether her failure to support was willful under the standards discussed above.

A parent who fails to support his or her child(ren) because the parent is financially unable to provide support is not willfully failing to provide support. *In re Mackenzie N.*, No. M2013-02805-COA-R3-PT, 2014 WL 6735151, at *6 (Tenn. Ct. App. Nov. 26, 2014); *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995). In *In re Ella M.I.*, No. M2013-01543-COA-R3-PT, 2014 WL 1778275, at *1 (Tenn. Ct. App. Apr. 30, 2014), paternal grandparents petitioned to terminate the mother's and father's parental rights on the grounds of willful failure to support. Mother appealed the trial court's decision terminating her rights. *In re Ella M.I.*, 2014 WL 1778275, at *2. There was no dispute concerning the fact that Mother had not paid any support during the relevant time period. *Id.* at *3. With respect to the issue of willfulness, however, the record showed the following:

> [T]he evidence in the record concerning Mother's income or ability to work shows that she was pregnant and unemployed at that time. Upon questioning, the paternal grandmother acknowledged that it would be "probably difficult" for a person to find a job while pregnant, and the grandfather stated that he did not know anything about Mother's

---

[7] The statute defining "abandonment" was amended effective July 1, 2018, and as amended, Tenn. Code Ann. § 36-1-102(1)(A) no longer includes the term "willful" in its definition of "abandonment." Instead, chapter 875, § 2, Tenn. Pub. Acts, codified at Tenn. Code Ann. § 36-1-102(1)(I), makes the absence of willfulness an affirmative defense to abandonment for failure to visit or support. Under the revised statute, the parent (or guardian) must prove by a preponderance of the evidence that the failure to visit or support was not willful. Because this change is substantive rather than procedural or remedial, however, the amended statute will not be applied retroactively to this case. *See In re D.A.H.*, 142 S.W.3d 267, 273 (Tenn. 2004).

employment history or her ability to pay $100.00 per month. Ms. S. testified that, for housing, Mother relied on other people's hospitality. In short, the paternal grandparents did not put on any proof to establish that, during the four months prior to the filing of the petition, Mother had the capacity to pay and lacked a justifiable excuse for not paying. Therefore, we cannot agree with the trial court's finding, by clear and convincing evidence, that Mother "had the ability to pay child support and willfully failed to do so."

*Id.* at *3 (footnote and citation omitted).

In the case of *In re Mackenzie N.*, 2014 WL 6735151, at *6, we specified that, "In making a willfulness determination, the court must review a parent's means, which includes both her income and available resources for purposes of support." The record in *In re Mackenzie N.* contained "scant evidence" concerning the mother's ability to provide child support during the relevant time period. *In re Mackenzie N.*, 2014 WL 6735151, at *6. Because the mother was an hourly worker and there was no information about the number of hours the mother worked, the court could not make any inference as to whether she was willfully underemployed. *Id.* Further, the record contained no information about other available resources. *Id.* at *7. With respect to some of the evidence, there was a lack of specificity as to the time period to which it related. *Id.* at *6-7. The court concluded: "Given the heavy burden necessary to interfere with a fundamental constitutional right, the proof offered here was simply insufficient to show that Mother's failure to support her children was willful." *Id.* at *7; s*ee also In re Morgan K.*, No. M2018-00040-COA-R3-PT, 2018 WL 5733291, at *9 (Tenn. Ct. App. Oct. 31, 2018) (noting the need for proof of "parent's financial situation or monthly expenses" before finding willful failure to support); *In re Michael B.*, No. M2015-02497-COA-R3-PT, 2016 WL 7486361, at *11 (Tenn. Ct. App. Oct. 6, 2016) (requiring evidence of employment, income, or non-monetary assets as well as expenses during the relevant period to establish willful failure to support); *In re Envy J.*, No. W2015-01197-COA-R3-PT, 2016 WL 5266668, at *14 (Tenn. Ct. App. Sept. 22, 2016) (concluding that "DCS presented insufficient evidence concerning Mother's income during the relevant time period" to establish that Mother's failure to support was willful); *In re Serenity B.*, No. M2013-02685-COA-R3-PT, 2014 WL 2168553, at *4 (Tenn. Ct. App. May 21, 2014) (reversing termination where record contained "no proof that Father had a job or the ability to pay support during the pertinent four months leading up to the filing of the petition").

In its analysis on the willfulness issue, the trial court stated, in part, as follows:

The Court has struggled with this ground. [Mother] has stated that the reason she was not working was because she did not have an identification card. The Court does not find that a justifiable excuse. . . . [T]he trial court

- 22 -

must consider the financial ability or capacity of a parent to pay support in determining the issue of willfulness. The Court queries is the parent's refusal to work without a justifiable excuse a defense to the, "willful," aspect of failure to pay support. If that is, in fact, the case, refusing to work and not paying support would be available as a defense to every termination of parental rights. . . . This Court does not believe that it was the intent of the legislature to view this part of the statute the way that it has traditionally been viewed. [Mother] did have some money coming in. She admits that she was able to pay a hundred dollars per month towards housing. Additionally, she testified that she was able to obtain illegal drugs. She was later able to get a job making $9 an hour as a housekeeper at a hotel in Opry Mills. The Court finds by clear and convincing evidence that [Mother] provided no support from May of 2016 to August of 2016. Further the Court finds that [Mother's] only excuse for not working was because she did not have identification. The Court finds by clear and convincing evidence that this is not a justifiable excuse. [Mother] had the ability to seek and obtain employment. She simply chose not to work and instead lived on the good will of others. The Court finds by clear and convincing evidence that [Mother's] failure to pay support from May of 2016 through August of 2016 was indeed willful.

As stated above, under the statute in effect at the time of the filing of the petition in August 2016, the burden was on the petitioners to prove that Mother's failure to support was willful. Willful unemployment can amount to the willful failure to support. *In re Austin D.*, No. E2012-00579-COA-R3-PT, 2013 WL 357605, at *11-12 (Tenn. Ct. App. Jan. 30, 2013). Such a finding could be supported, for example, by clear and convincing evidence that the parent is able to work but failed to actively pursue employment or other sources of income during the relevant time period. *In re Aaron E.*, No. M2014-00125-COA-R3-PT, 2014 WL 3844784, at *6 (Tenn. Ct. App. Aug. 4, 2014).

Applying the standards established in the caselaw reviewed above, we find insufficient evidence in the record to prove that Mother had the ability to provide support for Neveah during the relevant four-month time period. The small rental payments contributed by Mother's boyfriend went to help provide a roof over Mother's head at Mr. Jones's house for a few months. Once Cairo was born, Mother lived at the Elam Center treatment facility. As to Mother's ability to obtain drugs, she testified that she used whatever was available on the street: "It was just whatever those people [on the street] had that I used [which] is what I used. Because I didn't have any funds to buy any drugs." Thus, Mother's drug use does not establish her ability to support her children. The housekeeping job referenced by the trial court was outside the relevant time period. By the time of this job, Mother had completed drug rehabilitation.

Foster Parents failed to present clear and convincing evidence to establish that Mother was capable of working and paying child support during the relevant four-month period.

IV. Failure to manifest ability and willingness to parent.

The third and final ground for termination alleged by Foster Parents against Mother is her failure to manifest the ability and willingness to parent pursuant to Tenn. Code Ann. § 36-1-113(g)(14). Pursuant to this ground, a court may terminate parental rights in situations where:

> A legal parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14) (2016). This ground requires the petitioners to prove two elements by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1), (g)(14). First, Foster Parents must prove that Mother "failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child." Tenn. Code Ann. § 36-1-113(g)(14). If a party proves only the "ability" criterion or the "willingness" criterion, the requirements of the statute are not met, and this ground may not serve as a basis for terminating parental rights.[8] *In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018). Second, Foster Parents must prove that placing the children in Mother's "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14).

The subsection (g)(14) ground was added to the parental termination statute effective July 1, 2016. *See* TENN. PUB. ACTS ch. 919. The provision does not define any of its terms, including "substantial harm." In other contexts, we made the following observations about "substantial harm":

> "The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier 'substantial' indicates two things. First, it connotes a

---

[8] Some panels of this court have not required a failure to manifest both a willingness and an ability to assume responsibility for the child. *See In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *15 (Tenn. Ct. App. June 20, 2018).

real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not."

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)).

The trial court made the following findings in support of its decision to terminate Mother's parental rights under Tenn. Code Ann. § 36-1-113(g)(14):

At the time the petition was filed, [Mother] was not visiting with the minor child. She had no income. No job. No long-term stable housing. [Mother] was completely dependent on the goodness of others to provide for her daily needs. This Court finds by clear and convincing evidence that [Mother] has failed to manifest an ability to personally assume legal and physical custody of the child or finds her responsibility of the child [sic]. The court further finds that the [foster parents] have provided for this minor child since June 29th of 2015. The child has bonded with both [foster parents]. The minor child has certainly not bonded with [Mother]. [Mother], during at least part of the summer of 2016, was still testing positive for drug use. The Court will note that the baby Cairo she gave birth to in June 2016 tested positive for illegal drugs. The Court finds by clear and convincing evidence that placing physical custody of this child with [Mother] at the time the petition was filed would pose a severe risk of physical and psychological harm to the minor child. The Court finds by clear and convincing evidence that the petitioners have satisfied the ground alleged as substantial harm found at TCA 36-1-113(g)(14).

The trial court did not make a finding that Mother failed to manifest both an ability *and a willingness* to assume legal and physical custody of Neveah, as we have required. *See In re Ayden S.*, 2018 WL 2447044, at *7. The burden was on Foster Parents to prove both prongs of the termination ground by clear and convincing evidence. *In re Maya R.*, 2018 WL 1629930, at *7. For this reason alone, Mother's rights could not properly be terminated on the basis of Tenn. Code Ann. § 36-1-113(g)(14).

Because Foster Parents failed to prove by clear and convincing evidence a statutory ground for the termination of Mother's parental rights, we need not address the issue of best interest.

CONCLUSION

The judgment of the trial court is reversed, and this matter is remanded with costs of appeal assessed against the appellees, Christopher G. and Hope G., for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE